2023-1663

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

STUPP CORPORATION, A DIVISION OF STUPP BROS., INC.,
IPSCO TUBULARS INC., MAVERICK TUBE CORPORATION,
*Plaintiffs*

WELSPUN TUBULAR LLC USA,
*Plaintiff-Appellee*

v.

UNITED STATES,
*Defendant-Appellee*

HYUNDAI STEEL COMPANY,
*Defendant*

SEAH STEEL CORP.,
*Defendant-Appellant*

Appeal from the U.S. Court of International Trade
Case Nos. 1:15-cv-00334-CRK, 1:15-cv-00336-CRK, and
1:15-cv-00337-CRK
Judge Claire R. Kelly

## NONCONFIDENTIAL RESPONSE BRIEF OF PLAINTIFF-APPELLEE WELSPUN TUBULAR LLC USA

*Submitted by*
Roger B. Schagrin
Jeffrey D. Gerrish
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700
jgerrish@schagrinassociates.com
*Counsel for Welspun Tubular LLC USA*

*Only admitted in New York and New Jersey. Practice limited to matters before Federal courts and agencies.

FORM 9. Certificate of Interest                                   Form 9 (p. 1)
                                                                  March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2023-1663

**Short Case Caption** Stupp Corporation v United States

**Filing Party/Entity** Welspun Tubular LLC USA

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/06/2023

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Welspun Tubular LLC USA | | Welspun Corp., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| John W. Bohn, formerly of Schagrin Associates | Benjamin J. Bay, formerly of Schagrin Associates | |
| Jordan C. Kahn, formerly of Schagrin Associates | Kelsey M. Rule, formerly of Schagrin Associates | |
| Paul W. Jameson, formerly of Schagrin Associates | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................i

STATEMENT OF RELATED CASES ...............................................1

STATEMENT OF THE ISSUES........................................................3

STATEMENT OF THE CASE ...........................................................4

I.  Statutory Framework for Determining the Appropriate
    Comparison Method to Calculate Dumping Margins...............5

II. Commerce's Final Determination in the Underlying
    Investigation .................................................................................9

III. The CIT's Decisions in *Stupp I* and *Stupp II* ..........................11

IV. This Court's Decision in *Stupp III*..........................................12

V.  Remand Redetermination Pursuant to *Stupp III*...................14

VI. The CIT's Decision in *Stupp IV* ...............................................15

SUMMARY OF ARGUMENT ........................................................17

ARGUMENT....................................................................................22

I.  Standard of Review ....................................................................22

II. Commerce's Use of the Cohen's *d* Test as Part of the
    Differential Pricing Analysis Is a Reasonable Implementation
    of 19 U.S.C. § 1677f-1(d)(1)(B) and the Legislative Intent of
    Unmasking Targeted Dumping ...............................................25

III. The CIT's Decision Sustaining Commerce's Remand
     Redetermination Should Be Affirmed ....................................31

    A.  The CIT Properly Applied the Standard of Review ..........31

    B.  The CIT Correctly Concluded that Commerce's Remand
        Redetermination Addressed the Concerns Raised by the
        Court in *Stupp III* and Explained Why Its Use of the
        Cohen's *d* Test and the Large Threshold Is Reasonable ..36

1.    Applying the Cohen's $d$ Test to Non-Normal Data Does Not Produce an Upward Bias in the Calculated Effect Size ................................................................................ 38

2.    Applying the Cohen's $d$ Test to Small Data Groups Does Not Produce Less Accurate Results ............................. 41

3.    Applying the Cohen's $d$ Test to Groups of Data with Disparate and Small Variances Does Not Generate Erroneous Coefficient Values ........................................ 45

4.    The Large Threshold Signifies a "Grossly Perceptible" Difference and Is a Conservative Measure of Significance that Results in a Low Percentage of Instances in which the Average-to-Transaction Method Is Applied ...................................................................... 54

CONCLUSION ................................................................................. 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF CONFIDENTIAL MATERIAL

PROOF OF SERVICE

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), the confidential information in this brief is removed from single brackets on pages 51 and 57. The material removed from pages 51 and 57 is Defendant-Appellant SeAH Steel Corporation's confidential sales information that was submitted to the administrative record in the less-than-fair-value investigation on welded line pipe imports from Korea. Defendant-Appellant SeAH Steel Corporation requested business proprietary treatment for this information in the underlying proceeding, which is subject to limited disclosure only to authorized persons under an administrative protective order in accordance with 19 U.S.C. § 1677f(c)(1).

# TABLE OF AUTHORITIES

## Cases

*Albemarle Corp. & Subsidiaries v. United States,*
  821 F.3d 1345 (Fed. Cir. 2016) .............................................................. 29

*Altx, Inc. v. United States,*
  370 F.3d 1108 (Fed. Cir. 2004) .............................................................. 23

*Amoco Oil Co. v. United States,*
  234 F.3d 1374 (Fed. Cir. 2000) ................................................................ 1

*Apex Frozen Foods Private Ltd. v. United States,*
  144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) ....................................... 8-9

*Apex Frozen Foods Private Ltd. v. United States,*
  862 F.3d 1322 (Fed. Cir. 2017) ........................................................ 6-7, 32

*Boomerang Tube LLC v. United States,*
  856 F.3d 908 (Fed. Cir. 2017) ........................................................... 22-23

*Camp v. Pitts,*
  411 U.S. 138 (1973) ................................................................................ 24

*Ceramica Regiomontana, S.A. v. United States,*
  636 F. Supp. 961 (Ct. Int'l Trade 1986) ................................................ 33

*Ceramica Regiomontana, S.A. v. United States,*
  810 F.2d 1137 (Fed. Cir. 1987) .............................................................. 33

*Changzhou Hawd Flooring Co. v. United States,*
  848 F.3d 1006 (Fed. Cir. 2017) .............................................................. 29

*Chevron U.S.A., Inc. v. Natural Resources Defense Council,*
  467 U.S. 837 (1984) ........................................................................... 25-26

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197, 229 (1938)........................................................ 23

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1996)........................................................23-24

*Corus Staal BV v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007).............................................. 8

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996)............................................... 32

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015)........................................26, 32

*Koyo Seiko Co. v. United States,*
    20 F.3d 1156 (Fed. Cir. 1994)..............................................6-7

*Mid Continent Steel & Wire, Inc. v. United States,*
    940 F.3d 662 (Fed. Cir. 2019).........................................48, 54

*Mid Continent Steel & Wire, Inc. v. United States,*
    31 F.4th 1367 (Fed. Cir. 2022) ........................................33-35

*Nan Ya Plastics Corp. v. United States,*
    810 F.3d 1333 (Fed. Cir. 2016).......................................23, 42

*NSK Ltd. v. United States,*
    190 F.3d 1321 (Fed. Cir. 2003)..............................................54

*PSC VSMPO-Avisma Corp. v. United States,*
    688 F.3d 751 (Fed. Cir. 2012)...............................................32

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014).............................................24

*Simio, LLC v. FlexSim Software Products, Inc.,*
    983 F.3d 1353 (Fed. Cir. 2020)..............................................37

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ............................................... 42

*Soc Trang Seafood Joint Stock Co. v. United States*,
    321 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) .................................... 33-34

*Stupp Corp. v. United States*,
    359 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ................................ 2, 11-13

*Stupp Corp. v. United States*,
    365 F. Supp. 3d 1373 (Ct. Int'l Trade 2019) ................................ 2, 11-12

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ....................................... *passim*

*Stupp Corp. v. United States*,
    619 F. Supp. 3d 1314 (Ct. Int'l Trade 2023) ................................ *passim*

*Thai Pineapple Pub. Co. v. United States*,
    187 F.3d 1362 (Fed. Cir. 1999) ............................................... 32

*Tianjin Wanhua Co. v. United States*,
    179 F. Supp. 3d 1062 (Ct. Int'l Trade 2016) .................................... 42-43

*Timken v. United States*,
    240 F. Supp. 2d 1228 (Ct. Int'l Trade 2002) ........................................ 54

*Timken Co. v. United States*,
    354 F.3d 1334 (Fed. Cir. 2004) ............................................... 25

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013) ........................................ 22-23

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ............................................... 25

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ......................................................... 23

19 U.S.C. § 1516a(b)(2) .................................................................. 24

19 U.S.C. § 1673d(a)(1) .................................................................... 5

19 U.S.C. § 1677(35)(A) .................................................................... 5

19 U.S.C. § 1677(35)(B) .................................................................... 5

19 U.S.C. § 1677a(a) .......................................................................... 5

19 U.S.C. § 1677b(a)(1) ..................................................................... 5

19 U.S.C. § 1677f-1(d)(1)(A) ............................................................. 6

19 U.S.C. § 1677f-1(d)(1)(B) ..................................................... *passim*

19 U.S.C. § 1677f-1(d)(1)(B)(i) ....................................................... 46

19 U.S.C. § 3512(d) ........................................................................... 7

**Regulations**

19 C.F.R. § 351.414(b)(1) .................................................................. 6

19 C.F.R. § 351.414(b)(2) .................................................................. 6

19 C.F.R. § 351.414(b)(3) .................................................................. 7

19 C.F.R. § 351.414(c)(2) .................................................................. 6

**Federal Register Notices**

*Differential Pricing Analysis; Request for Comments,*
   79 Fed. Reg. 26,720 (Dep't Commerce May 9, 2014) ............................ 9

*Welded Line Pipe from the Republic of Korea*,
   80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) ............. 4, 9-11, 53

*Welded Line Pipe from the Republic of Korea*,
   80 Fed. Reg. 69,637 (Dep't Commerce Nov. 10, 2015) .......................... 4

## Other Authorities

Statement of Administrative Action Accompanying the Uruguay Round
Agreements Act,
   H.R. Rep. No. 103-316, vol. 1 (1994) ................. 6-8, 18, 20, 26, 29-30, 49

Uruguay Round Agreements Act,
   Pub. L. No. 103-465, 108 Stat. 4809 (1994) ........................................... 6

Plaintiff-Appellee Welspun Tubular LLC USA ("Welspun") respectfully submits this brief in response to the opening brief of Defendant-Appellant SeAH Steel Corporation ("SeAH") in its appeal of the decision by the U.S. Court of International Trade (the "CIT") in *Stupp Corp. v. United States*, CIT Consol. Court No. 15-00334 ("SeAH Br."). The Government of Canada and Canadian exporters of softwood lumber have also submitted a brief in support of SeAH's appeal as *amici curiae* ("*Amici* Br.").[1]

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Welspun makes the following statements:

1. An appeal in or from the same civil action or proceeding in the CIT was previously before this Court in *Stupp Corp. v. United States* (Appeal No. 2020-1857). SeAH appealed an earlier decision

---

[1] *See Amoco Oil Co. v. United States*, 234 F.3d 1374, 1377-1378 (Fed. Cir. 2000) ("An *amicus curiae*, by definition, is a friend of the court, not of the appellant. An *amicus* may support the appellant, preferably by providing a broader perspective than the appellant, who may be solely interested in winning its case…. It is the appellant's case, not a joint appeal by the appellant and *amicus*. Appellant must raise in its opening brief all the issues it wishes the court to address.").

issued by the CIT that sustained the rejection by the U.S.

Department of Commerce ("Commerce") of SeAH's administrative

case brief and sustained aspects of Commerce's differential pricing

analysis. *See Stupp Corp. v. United States*, 359 F. Supp. 3d 1293

(Ct. Int'l Trade 2019) ("*Stupp I*"); *see also Stupp Corp. v. United

States*, 365 F. Supp. 3d 1373 (Ct. Int'l Trade 2019) (denying

motion for reconsideration) ("*Stupp II*"). The panel presiding over

the prior appeal in this Court consisted of Judges Taranto,

Bryson, and Chen. On July 15, 2021, the CIT's judgment was

affirmed in part, vacated and remanded in part. *See Stupp Corp.

v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) ("*Stupp III*").

2. Although not "related" within the meaning of Federal Circuit Rule
   47.5, one appeal pending in this Court involves the same general
   legal issue and may directly affect or be directly affected by the
   Court's decision in this appeal. *See Marmen Inc. v. United States*
   (Appeal No. 2023-1877).

3. Although not "related" within the meaning of Federal Circuit Rule
   47.5, four cases pending in the CIT (two of which have been stayed
   pending the resolution of this appeal) involve the same general

legal issue and may be directly affected by the Court's decision in this appeal. *See Sahamitr Pressure Container Plc. v. United States* (CIT Ct. No. 23-00077) (stayed); *HiSteel Co. v. United States* (CIT Ct. No. 22-00142) (stayed); *Matra Americas, LLC v. United States* (CIT Consol. Ct. No. 21-00632); and *NEXTEEL Co. v. United States* (CIT Ct. No. 18-00083).

4. Counsel is not aware of any other case pending in this or any other court that may directly affect or be directly affected by the Court's decision in this appeal.

## STATEMENT OF THE ISSUES

1. Whether Commerce's methodological choice of using the Cohen's $d$ test as part of the differential pricing analysis is a reasonable means of implementing 19 U.S.C. § 1677f-1(d)(1)(B) and the legislative intent of unmasking situations where "targeted dumping" may be occurring.

2. Whether Commerce lawfully calculated SeAH's dumping margin using the average-to-transaction method for certain U.S. sales (*i.e.*, the U.S. sales that "passed" the Cohen's $d$ test with a large

effect size of 0.8 or greater) in the less-than-fair-value

investigation of welded line pipe imports from Korea.

## STATEMENT OF THE CASE

This appeal arises from Commerce's affirmative final

determination in the less-than-fair-value investigation of welded line

pipe imports from Korea. *See Welded Line Pipe from the Republic of*

*Korea*, 80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) ("Final

Determination") (Appx0216-0218), and accompanying Issues and

Decision Memorandum (Appx0219-0301), as amended by 80 Fed. Reg.

69,637 (Dep't Commerce Nov. 10, 2015) (Appx0195-0196). At issue is

Commerce's use of the Cohen's *d* test (*i.e.*, a generally recognized

statistical measure of effect size), the first of three tests in the

differential pricing analysis that Commerce applies in antidumping

proceedings to implement 19 U.S.C. § 1677f-1(d)(1)(B) and decide

whether it will use the default average-to-average or alternative

average-to-transaction comparison method to calculate dumping

margins. An overview of the statutory framework as well as the

relevant facts and procedural history of the case are set forth below.

## I.      Statutory Framework for Determining the Appropriate Comparison Method to Calculate Dumping Margins

In less-than-fair-value investigations, Commerce is tasked with determining whether imports of subject merchandise are being, or are likely to be, sold in the United States at less than fair value, *i.e.*, dumped. *See* 19 U.S.C. § 1673d(a)(1). Commerce makes this determination by comparing the export price (generally defined under 19 U.S.C. § 1677a(a) as the price at which the subject merchandise is sold in the United States) with the normal value (generally defined under 19 U.S.C. § 1677b(a)(1) as the price at which the foreign like product is sold in the exporting country). A product is sold at less than fair value when the product's export price is lower than its normal value, and the dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). After determining a dumping margin for each sale of subject merchandise, Commerce calculates a weighted-average dumping margin "by dividing the aggregate dumping margins … by the aggregate export prices and constructed export prices …." 19 U.S.C. § 1677(35)(B).

5

When calculating dumping margins, the statute generally provides that Commerce will use the average-to-average method.[2] 19 U.S.C. § 1677f-1(d)(1)(A). The average-to-average method has been the statutory default for investigations since Congress passed the Uruguay Round Agreements Act. *See Apex Frozen Foods Pvt. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017); *see also* Section 229 of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994). However, Congress recognized that the average-to-average method may not be equipped to detect "targeted dumping" (or "masked dumping") because sales of subject merchandise at lower prices would be averaged and offset by sales of subject merchandise at higher prices. *See Apex*, 862 F.3d at 1341 (citing *Koyo Seiko Co. v. United States*, 20

---

[2] The average-to-average method "involves a comparison of the weighted average of the normal values with the weighted average of the export prices (and constructed export prices) for comparable merchandise." 19 C.F.R. § 351.414(b)(1). The statute also provides the option to use the transaction-to-transaction comparison method (*i.e.*, comparing the normal values of individual transactions to the export prices of individual transactions), but this method is used only in "unusual circumstances, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom made." *Id.* § 351.414(b)(2) and (c)(2).

F.3d 1156, 1159 (Fed. Cir. 1994)); *see also* Statement of Administrative

Action Accompanying the Uruguay Round Agreements Act ("SAA"),

H.R. Doc. No. 103-316, at 842 (1994)[3] ("{T}he reluctance to use an

average-to-average methodology has been based on a concern that such

a methodology could conceal 'targeted dumping.' In such situations, an

exporter may sell at a dumped price to particular customers or regions,

while selling at higher prices to other customers or regions").

To provide Commerce with the authority to address targeted

dumping, Congress created an exception that permits the use of the

average-to-transaction method[4] as an alternative to the default

average-to-average method. *See* 19 U.S.C. § 1677f-1(d)(1)(B); *see also*

SAA, H.R. Doc. No. 103-316, at 843 (1994). Unlike the average-to-

average method, the average-to-transaction method does not provide

---

[3] By statute, the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

[4] The average-to-transaction method "involves a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise." 19 C.F.R. § 351.414(b)(3).

offsets for negative individual dumping margins and instead assigns a

zero dumping margin to sales of subject merchandise sold at or above

normal value. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1372

(Fed. Cir. 2007). In other words, it assigns a zero dumping margin to

sales that are not dumped.

The statute provides that the alternative average-to-transaction

method may be used if the following two conditions are met: "(i) there is

a pattern of export prices (or constructed export prices) for comparable

merchandise that differ significantly among purchasers, regions, or

periods of time, and (ii) {Commerce} explains why such differences

cannot be taken into account using {the average-to-average or

transaction-to-transaction methods}." 19 U.S.C. § 1677f-1(d)(1)(B). If the

two statutory conditions are satisfied, "Commerce's decision to consider

applying the average-to-transaction method is within its discretionary

power." *Stupp III*, 5 F.4th at 1351-1352.

Commerce assesses the criteria in 19 U.S.C. § 1677f-1(d)(1)(B) on

a case-by-case basis as prescribed by the SAA, and Commerce's

methodological approach has evolved over time as it has gained

experience with addressing targeted dumping. *See Apex Frozen Foods*

*Pvt. Ltd. v. United States*, 144 F. Supp. 3d 1308, 1320 n.13; *see also*

Remand Redetermination at 5-7 (Appx0032-0034). For over a decade,

Commerce's differential pricing analysis has been used in antidumping

proceedings as the methodology for deciding the appropriate comparison

method for calculating a respondent's dumping margin. *See Differential*

*Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (Dep't

Commerce May 9, 2014). Commerce has explained the mechanics of its

differential pricing analysis each time it has been applied. *See* Final

Determination Memorandum at 10 (Appx0228). This Court also has

provided a detailed description of the three tests in the analysis (*i.e.*, the

Cohen's *d* test, the ratio test, and the meaningful difference test) that

operate together to address the criteria under 19 U.S.C. § 1677f-

1(d)(1)(B) and unmask situations where targeted dumping may be

occurring. *See, e.g.*, *Stupp III*, 5 F.4th at 1346-1348.

## II.    Commerce's Final Determination in the Underlying Investigation

In the investigation, Commerce applied its differential pricing

analysis (*i.e.*, sequentially applying the Cohen's *d* test, the ratio test,

and the meaningful difference test) to each Korean respondent's sales of

subject merchandise during the period of investigation to determine

whether the criteria set forth in 19 U.S.C. § 1677f-1(d)(1)(B) were met.
The results of that analysis revealed whether the respondent's pricing
behavior masked dumping and determined the appropriate method for
comparing normal value to export price in the dumping margin
calculations. For SeAH (a Korean exporter selected as a mandatory
respondent), the results of the differential pricing analysis confirmed
that there existed a pattern of significant price differences among
purchasers, regions, or time periods, and the default average-to-average
method could not account for such differences. *See* Final Determination
Memorandum at 4 (Appx0222).

Because 39.72 percent of the value of SeAH's U.S. sales passed the
Cohen's *d* test (*i.e.*, where the value of the *d* coefficient is equal to or
greater than 0.8) and the average-to-average method alone could not
account for the full extent of dumping, Commerce used the "mixed"
method that involved an application of the average-to-transaction
method that was proportionate to the extent of masked dumping found
by Commerce. *Id.*; *see also* SeAH Final Calculation Memorandum at 3
(Appx1449). In other words, Commerce applied the average-to-
transaction method to sales that passed the Cohen's *d* test and the

10

average-to-average method to sales that did not. Using the mixed

method, Commerce calculated a 2.53 percent weighted-average

dumping margin for SeAH. Final Determination, 80 Fed. Reg. at 61,367

(Appx0217). SeAH subsequently appealed to the CIT and, among other

things, challenged various aspects of the differential pricing analysis.

## III.   The CIT's Decisions in *Stupp I* and *Stupp II*

In its initial decision, the CIT held that Commerce's application of

the differential pricing analysis (including the Cohen's *d* test) was

supported by substantial evidence and in accordance with law. *Stupp I*,

359 F. Supp. 3d at 1302-1306 (Appx0168-0176). The CIT explained that

the analysis "constitutes a reasonable methodology for identifying

patterns of prices that differ significantly" and noted that both the CIT

and this Court have upheld the steps underlying the analysis. *Id.* at

1304 and n.18. (Appx0172-0173). Addressing SeAH's specific arguments

on the Cohen's *d* test, the CIT stated that "the relevant inquiry is not

whether Commerce applies its differential pricing analysis in accord

with experts' guidance on the use of Cohen's *d*" and concluded that

SeAH had failed to explain why Commerce's application of the analysis

in the investigation was an unlawful or unreasonable way of

implementing 19 U.S.C. § 1677f-1(d)(1)(B). *Id.* at 1305 (Appx0173).

SeAH subsequently filed a motion requesting reconsideration of *Stupp I*, which the CIT denied in *Stupp II*. *See Stupp II*, 365 F. Supp. 3d at 1376-1379 (Appx0150-0156).

## IV.    This Court's Decision in *Stupp III*

SeAH appealed *Stupp I* to this Court. In its decision in that appeal, the Court recognized that "there is no statutory language telling Commerce how to detect patterns of significantly differing export prices" and "Commerce therefore has discretion to determine a reasonable methodology to implement the statutory directive." *Stupp III*, 5 F.4th at 1354. The Court affirmed specific aspects of Commerce's differential pricing analysis as a reasonable methodological choice to assess whether the statutory conditions under 19 U.S.C. § 1677f-1(d)(1)(B) are satisfied. *Id.* at 1351-1357. However, the Court stated that SeAH's arguments and non-record statistical literature introduced by SeAH on appeal raised concerns "relating to Commerce's application of the Cohen's *d* test in this case and, more generally, in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." *Id.* at 1357.

12

The Court did not hold that Commerce's use of the Cohen's *d* test was unlawful. In fact, the Court generally approved Commerce's use of "a conventional method for quantifying comparisons across discrete groups: counting the number of divergent sales prices, as identified by an effect-size test, and calculating the population percentage of those divergent sales prices." *Id.* at 1354. But the Court expressed concerns that not following the assumptions of normality, sufficient observation size, and roughly equal variances that the literature associates with the Cohen's *d* test can subvert the usefulness of the test and produce an upward bias that results in more sales passing the test. *Id.* at 1357-1359. The Court noted that Commerce relied on the results of the differential pricing analysis (and the sales that passed the Cohen's *d* tests) in deciding to apply the mixed method to calculate SeAH's non-*de minimis* dumping margin of 2.53 percent. *Id.* at 1360.

Based on these concerns, the Court vacated *Stupp I* in part and remanded the case "to give Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or

13

whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." *Id.*

## V.     Remand Redetermination Pursuant to *Stupp III*

On remand, Commerce reopened the record for the limited purpose of requesting that SeAH submit certain publications referenced in *Stupp III* that were not on the administrative record. *See* Commerce Record Reopening Memo (Appx3715-3718). SeAH filed a 1,717-page submission with the requested materials. *See* SeAH Factual Information Submission (Appx3719-5435). Welspun subsequently filed a submission that provided excerpts of documents that were omitted from the public version of SeAH's submission. *See* Welspun Factual Information Submission (Appx5436-5457). After considering the new materials on the record and comments submitted by SeAH and Welspun, Commerce filed its remand redetermination with the CIT on April 4, 2022. *See* Remand Redetermination (Appx0028-0101).

The remand redetermination fully addressed the concerns raised in *Stupp III*. Citing to the statistical literature on the remand record, Commerce's remand redetermination explained the distinction between statistical and practical significance (*see* Remand Redetermination at

11-14 (Appx0038-0041)), the importance of examining the entire

universe of data rather than a sample (*id.* at 14-16 (Appx0041-0043)),

the usefulness of Dr. Cohen's thresholds to interpret effect size and the

extent of price differences (*id.* at 16-19 (Appx0043-0046)), the materials

discussing the assumed parameters associated with the Cohen's *d* test

that were referenced in *Stupp III* (*id.* at 19-25 (Appx0046-0052)), and

*Stupp III*'s specific concerns regarding prices in a test group that hover

around the same value. *Id.* at 25-33 (Appx0052-0060). The remand

redetermination also responded to SeAH's objections to Commerce's use

of the Cohen's *d* test. *See id.* at 33-65 (Appx0060-0092).

In the end, Commerce concluded that the statistical concepts of

normality, sufficient observation size, and equal variances do not need

to be observed when the Cohen's *d* test is used as part of the differential

pricing analysis in antidumping proceedings. No changes were made to

SeAH's 2.53 percent dumping margin.

## VI.    The CIT's Decision in *Stupp IV*

The CIT sustained Commerce's remand redetermination. In

response to SeAH's arguments, the CIT explained that its role was to

review whether Commerce's methodology is a reasonable means of

15

implementing 19 U.S.C. § 1677f-1(d)(1)(B) and not whether Commerce's application of the Cohen's *d* test for its purposes conforms to the views of statisticians in publications. *Stupp IV*, 619 F. Supp. 3d. at 1324 n.8 and 1325 n.10 (Appx0018, Appx0020). The CIT acknowledged that the remand redetermination included an explanation that distinguished between applying the Cohen's *d* test to full populations rather than a sample, but the CIT did not sustain the remand redetermination on the basis of that explanation.[5] *See id.* at 1324 n.8 (Appx0017-0018). Nonetheless, as discussed below, the CIT concluded that Commerce's

---

[5] Throughout the remand redetermination, Commerce explains with reference to the statistical literature on the record that the limits that exist to ensure that a sample statistically represents the entire population need not be followed when the entire population is being examined. This explanation was provided in response to *Stupp III* and this Court's invitation for Commerce "to clarify its argument that having the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test." 5 F.4th at 1360. Even though the Court invited Commerce to clarify its position and build upon the argument made in *Stupp III*, the CIT stated that the distinction between a full population and a sample (as well as statistical and practical significance) is not "determinative of whether Commerce's methodology is reasonable" and that the Court already concluded in *Stupp III* that this argument "did not resolve its concern over whether the absence of certain assumptions forecloses Commerce's use of Cohen's *d* test." *Stupp IV*, 619 F. Supp. 3d at 1324 n.8 (Appx0017-0018).

explanation on remand adequately addressed the concerns discussed in

*Stupp III* and that Commerce's use of the Cohen's *d* test (including the

large 0.8 threshold as a measure of significance) alongside the ratio and

meaningful difference tests in the differential pricing analysis is a

reasonable method to determine whether there is a pattern of U.S.

prices that differ significantly among purchasers, regions, or time

periods. *See id.* at 1321-1328 (Appx0011-0027).

## SUMMARY OF ARGUMENT

The Court should affirm the CIT's judgment because the CIT

correctly held that Commerce's use of the Cohen's *d* test as part of the

differential pricing analysis is a reasonable method to address the

criteria set forth in 19 U.S.C. § 1677f-1(d)(1)(B). There is no statutory

language telling Commerce how to detect patterns of U.S. prices that

differ significantly among purchasers, regions, or time periods. As such,

Congress left a gap in the statute for Commerce to fill. Commerce filled

that gap by devising its differential pricing analysis, which reasonably

implements the text of the statute and the legislative intent of

unmasking situations where targeted dumping may be occurring.

The Cohen's $d$ test is a generally recognized statistical measure of effect size. The primary role of the Cohen's $d$ test in Commerce's differential pricing analysis is to identify whether price differences between U.S. sales are significant. It does this by quantifying the significance based on the variance in a respondent's own U.S. sales prices by customer, region, or time period. The resulting $d$ coefficient is interpreted as significant according to the test's large 0.8 threshold that signifies a grossly perceptible difference. Commerce's use of the Cohen's $d$ test is consistent with the SAA language that instructs Commerce to proceed on a case-by-case basis and to consider the price differences within the context of the specific industry and product under investigation.

The analysis does not end there because the differential pricing analysis functions as an integrated whole and the Cohen's $d$ test, ratio test, and meaningful difference test operate together to determine whether the statutory criteria are satisfied. In particular, the meaningful difference test provides additional context to the results of the Cohen's $d$ test and ratio test by assessing whether the price differences are significant in qualitative terms such that the average-to-

average method masks a meaningful amount of dumping. Commerce has devised a conservative methodology that has not resulted in the application of the average-to-transaction method to a significant number of respondents.

The CIT properly applied the reasonableness standard in its review of the remand redetermination. Under this standard, Commerce is under no obligation to undertake the impossible task of choosing a perfect or near-perfect methodology to carry out its statutory duties. Additionally, Commerce was not required to follow the teachings of statisticians on the Cohen's $d$ test simply because Commerce has decided in its expert opinion to rely on the Cohen's $d$ formula and the effect size coefficient corresponding to a grossly perceptible difference to identify whether price differences between customers, regions, or time periods are significant.

The remand redetermination fully addressed the concerns raised by this Court in *Stupp III*. Specifically, Commerce explained why its use of the Cohen's $d$ test as part of the differential pricing analysis is reasonable when the data being examined are not normally distributed, have a small number of observations, and have disparate (and

19

potentially small) variances. Applying the Cohen's $d$ test in this context does not produce an upward bias with more passing sales and higher dumping margins. As the CIT recognized, the differential pricing analysis operates as an integrated whole which looks at the frequency and impact of effect size to detect targeted dumping—not the effect size alone.

The fact that sales may pass the Cohen's $d$ test because a small price difference is given greater significance when the variances are small does not render the result inaccurate or erroneous. In fact, this result is entirely consistent with the SAA's directive for Commerce to proceed on a case-by-case basis "because small differences may be significant for one industry or one type of product, but not for another." Commerce's application of the Cohen's $d$ test assesses the significance of price differences based on the actual variances in the respondent's sales prices. SeAH presents a hypothetical of sales prices with "imperceptible" differences passing the Cohen's $d$ test (what SeAH alleges to be a "false-positive") that could result in the application of the average-to-transaction method. The standard here is not whether there are any unusual hypothetical scenarios that could possibly produce

20

anomalous results. Rather, the standard is whether Commerce's use of the Cohen's $d$ test, in conjunction with the ratio and meaningful difference tests, reasonably implements the language and purpose of the statute. SeAH has not demonstrated that the application of the Cohen's $d$ test to its sales data in the underlying investigation generated enough of what it calls "false-positives" that pushed the passing sales beyond the 33 percent threshold of the ratio test to result in the mixed application of the average-to-transaction method. There is no actual evidence that Commerce's application of the Cohen's $d$ test in the underlying investigation was distortive or unreasonable.

Finally, Commerce reasonably explained its use of the large 0.8 threshold to interpret the effect size and the magnitude of the price differences identified by the Cohen's $d$ test in the differential pricing analysis. Commerce considers a significant difference to be grossly perceptible in the same way that Dr. Cohen identified a large threshold as one that is grossly perceptible. The conservative standard along with the subsequent steps in the differential pricing analysis ensure the reasonable and limited application of the average-to-transaction method, as shown by the relatively small percentage of instances in

which the average-to-transaction method has been applied to respondents in less-than-fair-value investigations completed from 2015 through 2021.

Although SeAH disagrees with the CIT's decision and would prefer a recalculated dumping margin without any application of the average-to-transaction method, SeAH has failed to demonstrate that the CIT erred in sustaining the remand redetermination. Nor has SeAH demonstrated that the views expressed in the statistical literature on the application of the Cohen's *d* test render it unreasonable for Commerce to use the Cohen's *d* test as one step in a larger analysis to fulfill the statutory requirement that it identify whether there exists a pattern of U.S. prices that differ significantly among purchasers, regions, or time periods which results in masked dumping that cannot be sufficiently addressed through the average-to-average method. The Court should therefore affirm the CIT's judgment and uphold Commerce's methodology as reasonable.

## **ARGUMENT**

## I.   **Standard of Review**

This Court reviews final decisions of the CIT *de novo* and applies anew the same standard of review applied by the CIT. *See Boomerang*

*Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013)). Accordingly, the Court will uphold any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Although this Court's review is *de novo*, the Court gives "great weight" to the CIT's informed view, and the CIT's opinion is "nearly always the starting point of {the Court's} analysis" as the CIT has unique and specialized expertise in addressing antidumping law issues on a daily basis. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016) (quotations and citation omitted).

The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from

being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996). In addition, judicial review is limited to the administrative record before Commerce. *See* 19 U.S.C. § 1516a(b)(2); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("{T}he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014) ("Our review is limited to the record before Commerce in the particular review proceeding at issue and includes all evidence that supports or detracts from Commerce's conclusions.").[6]

---

[6] In this regard, Welspun objects to the reference to non-record material in the brief submitted by *amici curiae*. *See Amici* Br. at 27 n.4. In *Stupp III*, the Court considered non-record materials introduced by SeAH on appeal for the narrow purpose of understanding basic statistical principles discussed in publications that were prepared in the ordinary course. *See Stupp III*, 5 F.4th at 1357-1359. The CIT similarly considered non-record materials so that it "may recognize the basic statistical principles discussed in these texts." *Stupp IV*, 619 F. Supp. 3d at 1320 (Appx0009). In contrast, the non-record material cited by *amici curiae* should not be considered by the Court in this appeal because it was prepared in anticipation of litigation at the behest of the Government of Canada and has not been relied upon by SeAH at any point in the administrative proceedings, in its briefs filed with the CIT, or in its opening brief in this appeal.

24

When determining whether Commerce's interpretation and application of the statute are in accordance with law, the Court applies the two-step analysis established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). The Court first examines "whether Commerce has directly spoken to the precise question at issue," and, if it has, the agency must comply with Congress's clear intent. *Id.* at 842-843. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. "Any reasonable construction of the statute is a permissible construction." *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004). Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009).

## II.    Commerce's Use of the Cohen's *d* Test as Part of the Differential Pricing Analysis Is a Reasonable Implementation of 19 U.S.C. § 1677f-1(d)(1)(B) and the Legislative Intent of Unmasking Targeted Dumping

As this Court has recognized, "there is no statutory language telling Commerce how to detect patterns of significantly differing export

25

prices." *Stupp III*, 5 F.4th at 1354. Looking beyond the statutory text, the SAA states only that "in determining whether a pattern of significant price differences exist{s}, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA, H.R. Doc. No. 103-316, at 843 (1994). By not specifying a methodology to determine whether a pattern of significant price differences exists, Congress "left a gap for {Commerce} to fill." *Chevron*, 467 U.S. at 843. When "a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests," Commerce "may perform its duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (internal quotations omitted).

Commerce's use of the Cohen's *d* test as the first of three tests in the differential pricing analysis reasonably implements the statutory text. The Cohen's *d* test, the ratio test, and the meaningful difference test are applied in sequential order, and each test has a primary role in addressing the statutory criteria. *See* Remand Redetermination at 62-64 (Appx0089-91). The Cohen's *d* test determines whether a

respondent's U.S. sales prices differ significantly by customer, region, or time period, the ratio test assesses whether the extent of prices that differ significantly constitutes a pattern, and the meaningful difference test concludes the analysis by evaluating whether the average-to-average method can account for such differences. *See id.* The three tests operate together to determine whether there exists a pattern of U.S. prices that differ significantly among purchasers, regions, or time periods which cannot be unmasked using the average-to-average method.

Although the statistical literature on the record includes views on the "correct" application of the Cohen's *d* test, Commerce is not beholden to apply the Cohen's *d* test as explained in the literature. Commerce must devise a methodology that reasonably implements the statutory requirement to determine whether U.S. prices differ significantly. The differential pricing analysis does exactly that. Congress has not defined "significantly" as that term is used in 19 U.S.C. § 1677f-1(d)(1)(B). Commerce has reasonably filled that gap in the statute by quantifying significance based on the results of the Cohen's *d* test, a generally recognized statistical measure of effect size.

27

Commerce uses the Cohen's *d* test to measure the significance of price differences based on the variance in a respondent's own U.S. sales prices by customer, region, or time period and based on the large 0.8 threshold that signifies a grossly perceptible difference. *See* Remand Redetermination at 17-19 and 54-55 (Appx0044-0046, Appx0081-0082).

In addition, Commerce does not rely solely on the results of the Cohen's *d* test to determine whether U.S. prices differ "significantly." The three tests of the differential pricing analysis operate together and each test serves a purpose that goes beyond its primary role. When the Cohen's *d* test is applied and passing sales with a *d* coefficient of 0.8 or greater are identified as sales with significant price differences in quantitative terms, and when the ratio test finds that the extent of passing sales constitutes a pattern, the meaningful difference test provides additional context to the results. Specifically, the meaningful difference test assesses whether the price differences are significant in qualitative terms (*i.e.*, whether the pattern of significant price differences masks dumping under the average-to-average method). *See id.* at 31-32 (Appx0058-0059). In this way, the differential pricing analysis functions as an integrated whole. Commerce's use of the

28

Cohen's *d* test alongside the ratio test and meaningful difference test is a reasonable method to determine whether the statutory preconditions for the application of the average-to-transaction method are satisfied.

Furthermore, Commerce's use of the Cohen's *d* test (and the concept of effect size) in the differential pricing analysis reasonably fulfills the legislative intent of unmasking situations where targeted dumping may be occurring by following the SAA's instruction to proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA, H.R. Doc. No. 103-316, at 843 (1994). The mandatory respondents selected for individual examination in antidumping proceedings are assumed to be representative of the subject country's industry at large and the pricing practices of exporters in the subject country. *See Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016); *see also Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017). In each case, the Cohen's *d* test is applied to the entire universe of a mandatory respondent's U.S. sales data on a product-specific basis, and "the variability in the data (*i.e.*, variance) is the yardstick by which the difference in the means is measured."

Remand Redetermination at 23 (Appx0050). This means that "{w}hen there is a large variation in the prices within the groups of prices, then it requires a larger difference in the mean prices to find that the difference is significant than if the variation in the prices within the groups of prices were small, which would require a smaller difference in the mean prices to find the same level of significance." *Id.* at 55 (Appx0082). Said another way, consistent with the SAA, the Cohen's *d* test allows Commerce to take a case-by-case approach to the various industries and products that Commerce investigates as "the difference is measured specific to the industry, product, and the individual company because it is based on the prices of the industry, product, and company themselves whose difference is being gauged." *Id.*

Lastly, in practice, Commerce's use of the Cohen's *d* test and the large 0.8 threshold as part of the differential pricing analysis is a conservative method that has not resulted in the application of the average-to-transaction method to a significant number of respondents. As Commerce explained in the remand redetermination, it applied the average-to-transaction method to roughly 20 percent of all respondents with calculated rates (*i.e.*, exclusive of respondents with rates based

entirely on facts otherwise available with an adverse inference) in final

determinations issued in calendar year 2015 (the year of the final

determination of the underlying investigation) and calendar year 2021

(the most recent calendar year prior to the remand redetermination).

*See id.* at 32 and Attachment 1 (Appx0059, Appx0093-0094). The

limited application of the average-to-transaction method means that it

is the exception rather than the rule and that the differential pricing

analysis results in a finding of targeted dumping in a relatively small

percentage of instances "where masked dumping meaningfully impedes

the {average-to-average} method from calculating an accurate

weighted-average dumping margin." *Id.* at 32 (Appx0059).

For all of these reasons, the Court should uphold Commerce's use

of the Cohen's *d* test in the differential pricing analysis as a reasonable

implementation of 19 U.S.C. § 1677f-1(d)(1)(B) and the legislative intent

of unmasking situations in which targeted dumping may be occurring.

## III.   The CIT's Decision Sustaining Commerce's Remand Redetermination Should Be Affirmed

### A.    The CIT Properly Applied the Standard of Review

The bulk of SeAH's arguments on appeal (as well as the

arguments raised by *amici*) rely on statistical literature on the Cohen's

31

*d* test and SeAH's interpretation of the "correct" application of the test. It is thus critical to establish the role that the statistical literature has in the Court's review. While the statistical literature is relevant, it is not dispositive to the issue on appeal under the applicable standard of review. The CIT understood this and properly applied the standard of review in holding that Commerce's use of the Cohen's *d* test as part of the differential pricing analysis is a reasonable method to analyze and implement the criteria set forth in 19 U.S.C. § 1677f-1(d)(1)(B).

It is well-established that Commerce has the discretion to choose a methodology to assess whether the statutory criteria under 19 U.S.C. § 1677f-1(d)(1)(B) are satisfied. *JBF RAK LLC*, 790 F.3d at 1363; *Apex*, 862 F.3d at 1345-1346 and 1350. SeAH does not dispute this. Indeed, Commerce is owed "tremendous deference" because it is the "master of antidumping law" and has expertise in the "complex economic and accounting decisions of a technical nature" required to administer the statute. *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (quoting *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999), and *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996)). The "relevant standard for

reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness …." *Stupp III*, 5 F.4th at 1353. Thus, "{a}s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (Ct. Int'l Trade 1986), *aff'd*, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

Under this standard, Commerce is under no obligation to undertake the impossible task of choosing a perfect or near-perfect methodology to carry out its statutory duties. Nor is Commerce obligated to follow the teachings of statisticians on the Cohen's *d* test simply because Commerce has decided in its expert opinion to rely on the Cohen's *d* formula and the effect size coefficient in antidumping proceedings to identify whether price differences between customers, regions, or time periods are significant. As the CIT explained:

> Although SeAH claims that academic sources do not support Commerce's use of Cohen's *d* in its differential pricing analysis, this argument is inapposite. SeAH's decision to substantially advance its arguments using labels taken from

statistical literature does not alter the court's obligation on review. *See Soc Trang Seafood Joint Stock Co. v. United States*, 321 F. Supp. 3d 1329, 1339 n.13 (Ct. Int'l Trade 2018) ("the fact that Commerce has adopted a methodology based upon a statistical tool known as Cohen's *d*, and chooses to refer to this methodology as Cohen's *d*, does not diminish the discretion granted to Commerce"); *see also Mid Continent Steel & Wire, Inc. v. United States*, 31 F.4th 1367 (Fed. Cir. 2022) ("Commerce's job is not to follow a statistical test as explained in published literature for its own sake, but to implement the statutory mandate to determine when prices of certain groups 'differ significantly'").

*Stupp IV*, 619 F. Supp. 3d at 1324 n.8 (Appx0018). The same sentiment is stated elsewhere in the CIT's decision. *See, e.g.*, *id.* at 1325 n.10 ("The task of the court is not to interpret the meaning of literature treating with correct application of Cohen's *d*. Rather, the court must determine whether Commerce's methodology is reasonable in light of considerations that run counter to its decision.") (Appx0020).

That is not to say that the statistical literature on the Cohen's *d* test is irrelevant and can be disregarded without any consideration by the agency because of the discretion afforded under the statute. The CIT referenced this Court's decision in *Mid Continent*, which SeAH also references in its brief. *See* SeAH Br. at 15. In that case, the Court reaffirmed that "{i}n implementing a statutory mandate, an agency is not duty-bound to follow published literature when, *e.g.*, the literature

34

is inapplicable to the specific problem before the agency or is not itself well grounded." *Mid Continent*, 31 F.4th at 1381. The Court additionally stated that in a situation where Commerce embraces a statistical test like the Cohen's *d* test and relies on statistical literature to carry out its statutory duties, Commerce needs a "reasonable justification" if its application of the statistical test does not fully conform with the teachings in the statistical literature. *See id.*

The key takeaway is that the Court's application of the reasonableness standard of review does not turn on whether Commerce has applied the Cohen's *d* test as explained in published literature. Rather, the reasonableness standard of review asks whether Commerce's methodological choice of using the Cohen's *d* test as part of the differential pricing analysis is a reasonable means of effectuating the statute's text and purpose of unmasking situations where targeted dumping may be occurring. Commerce's methodological choice is not rendered *ipso facto* unreasonable simply because Commerce's application of the Cohen's *d* test for its purposes in antidumping proceedings might not accord with certain views in the statistical literature on the "correct" application of the test for behavioral science

35

research. As the CIT explained, "Commerce's reference to Cohen's work does not circumscribe its discretion … in a new context …." *Stupp IV*, 619 F. Supp. 3d at 1327 (Appx0024).

The statistical literature that SeAH relies upon and interprets to advance its arguments is at best detracting evidence that Commerce was required to address to justify its use of the Cohen's *d* test as a reasonable methodology to implement 19 U.S.C. § 1677f-1(d)(1)(B). Commerce did exactly that in the remand redetermination. It explained why its use of the Cohen's *d* test as the first step in the differential pricing analysis is reasonable in the face of SeAH's challenges. And, as demonstrated below, the CIT correctly concluded that Commerce satisfied its burden of explanation and addressed all arguments and evidence that ran counter to its use of the Cohen's *d* test as part of the differential pricing analysis.

**B.  The CIT Correctly Concluded that Commerce's Remand Redetermination Addressed the Concerns Raised by the Court in *Stupp III* and Explained Why Its Use of the Cohen's *d* Test and the Large Threshold Is Reasonable**

In its decision, the CIT examined whether Commerce's remand redetermination adequately addressed the concerns raised by the Court

36

in *Stupp III* that Commerce's application of the Cohen's *d* test to a

respondent's sales data in antidumping proceedings may undermine the

usefulness of the test and the large 0.8 threshold used by Commerce as

an interpretive cutoff for identifying passing U.S. sales. The CIT

explained that *Stupp III* "identified three potential scenarios in which

use of Cohen's *d* could be problematic: first, when the distribution of a

respondent's sales data is not normal, second, when the test groups

have few data points, and third, when there is minimal variance in a

respondent's sales." *Stupp IV*, 619 F. Supp. 3d at 1323 (Appx0016)

(citing *Stupp III*, 5 F.4th at 1357-1359).

Although the CIT did not sustain the remand redetermination

based on Commerce's explanation that distinguishes between applying

the Cohen's *d* test to full populations rather than a sample, *see id.* at

1324 n.8 (Appx0017-0018),[7] the CIT decided that the remand

redetermination's explanation that the Cohen's *d* test does not operate

---

[7] The Court may still affirm the CIT's judgment sustaining the remand
redetermination on this alternative basis. *See Simio, LLC v. FlexSim
Software Products, Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) ("{W}e
may affirm on any grounds for which there is a record sufficient to
permit conclusions of law, even grounds not relied upon by the district
court." (internal quotations and citations omitted)).

in a vacuum but as part of the differential pricing analysis as a whole

dispels each of the three concerns described by this Court in *Stupp III*.

*See id.* at 1324-1328 (Appx0017-0027). As explained below, none of

SeAH's arguments demonstrates that the CIT incorrectly concluded

that the remand redetermination adequately addressed the concerns

described in *Stupp III* and explained that the Cohen's *d* test is

reasonably applied in antidumping proceedings when the data being

examined are not normally distributed, have a small number of

observations, and have disparate (and potentially small) variances.

### 1. Applying the Cohen's *d* Test to Non-Normal Data Does Not Produce an Upward Bias in the Calculated Effect Size

Regarding the first concern raised in *Stupp III* (*i.e.*, applying the

Cohen's *d* test when the distribution of a respondent's sales data is not

normal), the CIT observed that the statistical literature indicates that

"{t}he assumption of normality is satisfied when a fixed percentage of

the population falls within each standard deviation from the mean—in

other words, that a population density graph generally shows a

symmetrical, bell-shaped curve." *Stupp IV*, 619 F. Supp. 3d at 1323

(Appx0016) (citing publication by Starnes, Yates, and Moore at

Appx5371). Addressing SeAH's reliance on the statistical literature and its assertion that "the usefulness of Cohen's test is compromised when comparing data sets with non-normal distributions," the CIT reiterated that under the applicable standard of review it need not discern the "correct" application of the Cohen's $d$ test in the statistical literature *Id.* at 1325 n.10 (Appx0020). The CIT nonetheless accepted the basic and logical notion that "a relatively large-tailed distribution (i.e., with large standard deviation) in a test group would tend to decrease Cohen's $d$ coefficient, while the opposite would result in an increase." *Id.* at 1325 (Appx0020) (citing Remand Redetermination at 29 (Appx0056)).

The concern expressed regarding non-normal data in *Stupp III* was predicated on an understanding that applying the Cohen's $d$ test to non-normal data "may produce an upward bias in the calculated effect size" and "might produce more 'passing' results …, which would tend to exaggerate dumping margins." *Stupp III*, 5 F.4th at 1359. But Commerce explained that the statistical literature does not show a bias

in one direction or the other when the Cohen's *d* test is applied to non-normal data.

Pointing to an example from Professor Coe's publication that compares effect-size differences for normal and non-normal data, Commerce explained that the normal and non-normal data in the example both have an effect size equal to one. *See* Remand Redetermination at 22 (Appx0049) (citing publication by Coe at Appx4342-4343). The difference in the means for the normal data is shown in Figure 3(a), and the difference in the means for the non-normal data is shown in Figure 3(b). *See id.* Professor Coe's example does not show an upward bias when the Cohen's *d* test is applied to non-normal data. In fact, Commerce found that the effect size of one "underestimates the actual difference in the means" in the non-normal data because a comparison of Figure 3(a) and Figure 3(b) shows that the difference in the means in the non-normal data is greater than in the normal data. *Id.* This comparison of effect-size differences between normal data and non-normal data indicates that it is "less likely that

Commerce' methodology will result in finding prices that differ
significantly among purchasers, regions, or time periods."[8] *Id.*

Thus, Commerce reasonably addressed the concern in *Stupp III* by
pointing out that the statistical literature does not demonstrate that
applying the Cohen's *d* test to non-normal data produces an upward
bias such that it inappropriately tilts the scales in favor of applying the
average-to-transaction method. SeAH has not demonstrated to the
contrary.

### 2. Applying the Cohen's *d* Test to Small Data Groups Does Not Produce Less Accurate Results

Regarding the second concern raised in *Stupp III* (*i.e.*, applying
the Cohen's *d* test when the data groups being compared are small), the
CIT stated that "{t}he assumption of size is satisfied when the
population is sufficiently large." *Stupp IV*, 619 F. Supp. 3d at 1323
(Appx0016) (citing publication by Cohen at Appx3764). In Commerce's
application of the Cohen's *d* test, the test group and the comparison

---

[8] *Amici* also state that "the examples from Coe, Li, and Algina happen
to reflect violations of the assumptions that lead to smaller *d*
coefficients" and only "the Grissom analysis shows larger *d* coefficients
associated with smaller sample sizes." *Amici* Br. at 30.

41

group each include "separate populations of sales prices" that are not sampled and instead represent "all of the sales of the comparable merchandise to each group." Remand Redetermination at 15 (Appx0042). This means that "the sales to each of these two groups, the test and comparison group, themselves constitute the full population of data in the context of the calculation of the mean, standard deviation, and Cohen's *d* coefficient for the purpose of the pattern requirement."[9] *Id.*

In the remand redetermination, Commerce explained that "price differences can arise independent of the number of observations in

---

[9] SeAH states, in a footnote, that it is questionable whether Commerce uses the Cohen's *d* test to examine the full population of data rather than a sample. SeAH Br. at 18 n.25. SeAH failed to exhaust its administrative remedies by not including this argument in its comments filed with Commerce on the draft remand redetermination. *See* Remand Redetermination at 49-50 (Appx0076-0077) ("{T}he U.S. price data used in the Differential Pricing Analysis generally, and in the Cohen's *d* test specifically, include the full population of U.S. sales prices. SeAH has not contested this fact, let alone provided evidence or argument to the contrary."); *see also Nan Ya*, 810 F.3d at 1350 (applying exhaustion doctrine for failure to raise argument in administrative draft remand comments). Further, it is well-settled that substantive arguments raised in footnotes are deemed waived. *See SmithKline Beeacham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006); *see also Tianjin Wanhua Co. v. United States*, 179 F. Supp.

*(footnote continued on next page)*

either group of data, *i.e.*, the test or comparison group of prices," and

"{t}he difference in the mean prices can be small whether the test or

comparison group include two sale prices or two thousand sale prices."

Remand Redetermination at 58 (Appx0085). But even if the Cohen's *d*

values of small groups were less accurate than for large groups, the CIT

reasoned that this possibility "does not by itself render Commerce's use

of Cohen's test unreasonable" because Commerce also explained that

the "Cohen's *d* analysis does not stand alone, and operates together

with the ratio test and meaningful difference test." *Stupp IV*, 619 F.

Supp. 3d at 1325 (Appx0019).

SeAH complains that Commerce cannot simultaneously take the

position that each test within the differential pricing analysis

independently addresses a specific requirement under the statute (*e.g.*,

the Cohen's *d* test addresses whether price differences are "significant")

*and* the position that the three tests of the differential pricing analysis

work together to address the statutory criteria and must be evaluated

_____

(*footnote continued from previous page*)

3d 1062, 1067 (Ct. Int'l Trade 2016). Accordingly, SeAH has both failed
to exhaust its administrative remedies before the agency and waived
the argument.

as an integrated whole. *See* SeAH Br. at 11, 33-34, and 33 n.47.

However, the two positions are not mutually exclusive. Although each of

the tests in Commerce's analysis is applied in sequential order and has

a primary role in the analysis that is linked to the statutory

requirements, the three tests operate together to determine whether

there exists a pattern of U.S. prices that differ significantly among

purchasers, regions, or time periods which results in masked dumping

that cannot be accounted for by the average-to-average method.

As Commerce explained, the meaningful difference test "imposes a

contextual interpretation on the results of the Cohen's *d* test." Remand

Redetermination at 31 (Appx0058). When the Cohen's *d* test indicates

that passing sales had significant price differences in *quantitative*

terms, the results of the meaningful difference test may show that the

price differences are not significant in *qualitative* terms as the

differences in prices have not masked a meaningful amount of dumping.

*See id.* at 31-32 (Appx0058-0059). The interplay of the tests is critically

important, as the CIT recognized that "Commerce's differential pricing

analysis looks at the frequency and impact of effect size to detect

targeted dumping—not the effect size alone." *Stupp IV*, 619 F. Supp. 3d

44

at 1325 (Appx0019). Thus, contrary to SeAH's argument, the CIT did
not err by considering the differential pricing analysis as an integrated
whole in its review of whether Commerce's use of the Cohen's *d* test is
reasonable.

>    **3.    Applying the Cohen's *d* Test to Groups of Data
>           with Disparate and Small Variances Does Not
>           Generate Erroneous Coefficient Values**

Regarding the third concern raised in *Stupp III* (*i.e.*, applying the
Cohen's *d* test when the data groups being compared have disparate
variances), the CIT stated that "{t}he assumption of homogeneous
variances is satisfied when the standard deviations of test and
comparison groups are similar." *Stupp IV*, 619 F. Supp. 3d at 1323
(Appx0016) (citing publication by Grissom at Appx4316). The CIT noted
that *Stupp III*'s concern here is that comparing groups of data may
produce inaccurate passing results in the Cohen's *d* test when the data
consists of prices that have disparate and small variances because they
hover around the same value. *Id.* at 1327 (Appx0024).

In this regard, SeAH argues that an "examination of SeAH's
actual prices in this case demonstrates that Commerce has found a
'large' effect even when the price differences are not visually

discernible" and that "{v}isual inspection of the actual individual sales prices … does not reveal any actual pattern by customer." SeAH Br. at 49-50 and 52. As an initial matter, SeAH misunderstands the primary purpose for which Commerce uses the Cohen's $d$ test in its differential pricing analysis. As Commerce explained, it applies the Cohen's $d$ test to determine whether prices differ significantly. *See* Remand Redetermination at 54 (Appx0081). To determine the existence of a pattern, Commerce uses "a different test, the ratio test, which assesses whether the extent of prices that differ significantly constitute a pattern." *Id.* The Cohen's $d$ test and the ratio test of the differential pricing analysis (in conjunction with the meaningful difference test) work in tandem to address the statutory criteria under 19 U.S.C. § 1677f-1(d)(1)(B)(i).

Additionally, SeAH is wrong that the Cohen's $d$ test generated a "false-positive" when it examined SeAH's sales of control number 1-03-03-06-1 to customer 102020 and to all other customers. *See* SeAH Br. at 50-53. SeAH conducts no statistical analysis whatsoever and concludes based on a subjective eye test that the prices to customer 102020 are "clustered precisely in the middle of the prices for sales of that product

46

to other customers." *Id.* at 53. Commerce's remand redetermination explained that the Cohen's *d* test determines whether price differences are significant in relation to the variances of the individual sales prices on a product-specific basis within the test and comparison groups. *See* Remand Redetermination at 55 (Appx0082) ("When there is a large variation in the prices within the groups of prices, then it requires a larger difference in the mean prices to find that the difference is significant than if the variation in the prices within the groups of prices were small, which would require a smaller difference in the mean prices to find the same level of significance."). From this explanation, the CIT aptly concluded that "Commerce's approach tailors the question of what is a significant difference in price to the pricing parameters of different products" and "Commerce's choice of a measurement that is a function of standard deviation as a uniform approach to identify differences as significant is reasonable, even if the absolute difference in means is small." *Stupp IV*, 619 F. Supp. 3d at 1326 (Appx0022).

SeAH's label of a "false-positive" is baseless and simply represents a disagreement with Commerce's interpretation of "significantly."[10] The fact that sales may pass the Cohen's $d$ test because a small price difference is given greater significance when the variances are small does not render the result inaccurate or erroneous. *See* Remand Redetermination at 59 (Appx0086). This Court previously has endorsed Commerce's rationale that "even a small absolute difference in the means of the two groups can be significant (for the present statutory purpose) if there is a small enough dispersion of prices within the overall pool as measured by a proper pooled variance or standard deviation." *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d

---

[10] Contrary to SeAH's assertions otherwise, Commerce's remand redetermination did dispute the "false-positive" label. *See* SeAH Br. at 26 ("Commerce's Redetermination does not appear to dispute the conclusion that the example set forth in the *Stupp III* decision would generate a false-positive 'passing' result under the Cohen's $d$ test."); *but see* Remand Redetermination at 59 (Appx0086) ("Further, SeAH misleadingly labels the results of its example as a 'false-positive.'").

662, 673 (Fed. Cir. 2019). The results in these situations are not "false-positives" as SeAH argues.

SeAH's example using the prices to customer 102020 simply shows that whether price differences are found to be significant under the Cohen's *d* test depends on the variances of the prices in each of the two populations being compared. Where the variances are small, this means that a small difference in the means will be considered more significant. *See* Remand Redetermination at 23 (Appx0050). This is an inherent feature of the Cohen's *d* test. The SAA instructs Commerce to choose a methodology that will allow it to "proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." *See* SAA, H.R. Doc. No. 103-316, at 843 (1994). Consistent with the SAA, the Cohen's *d* test measures significance on an industry and product-specific basis because the test quantifies effect size based on the variance in a respondent's own U.S. sales prices. *See* Remand Redetermination at 55 (Appx0082). The difference in the weighted-average prices in SeAH's example was found to be significant (*i.e.*, the Cohen's *d* coefficient was greater than or equal to the 0.8 large threshold) based on the variance of the sales

49

prices to customer 102020 and the variance of the sales prices to other

customers. As the CIT recognized, "a small variance means a small

difference in price will be more significant, and a passing result under

these circumstances is not necessarily 'erroneous.'" *Stupp IV*, 619 F.

Supp. 3d at 1327 (Appx0024).

SeAH presents an example that it claims would suggest that "the

prices for sales of control number 1-03-03-06-1 to customer 102020 were

*lower* than the prices for sales to other customers" when "in reality, the

prices for sales to customer 102020 were *higher* than the prices for all

sales to other customers made on the same date." SeAH Br. at 53. Even

though SeAH's example claims to compare sales prices on a customer-

by-customer basis, SeAH focuses its attention only on the sales prices

made on the same date that sales were made to customer 102020.

Despite SeAH's contention otherwise (*see id.* at 53 n.78), Commerce was

correct when it stated in the remand redetermination that "SeAH's

analysis inappropriately combines purchaser and time periods into a

single comparison, which is inconsistent with Commerce's

methodology." Remand Redetermination at 60 (Appx0087). When

looking at the sales to customer 102020 compared to all other customers

during the entirety of the period of review (as Commerce does in its

application of the Cohen's *d* test), SeAH's scatter diagram shows that

the prices to customer 102020 were [    SALES DATA    ] to all other

customers. *See* SeAH Br. at 52. SeAH thus has not shown that

Commerce's application of the Cohen's *d* test in this case led to

unreasonable results.

    Even assuming, *arguendo*, that low-variance sales passing the

Cohen's *d* test present a concern, Commerce's remand redetermination

explains that the differential pricing analysis operates as an integrated

whole and the average-to-transaction method would not be applied in

the "extreme" hypothetical scenario described in *Stupp III* involving

prices with small variances and that hover around the same value. *See*

Remand Redetermination at 30-32 (Appx0057-0059). While in such a

scenario low-variance sales may pass the Cohen's *d* test and contribute

to the total sales value of passing sales examined in the ratio test, the

meaningful difference test would not support the application of the

average-to-transaction method. This is the case even when the normal

value is equal to the average U.S. price, a scenario in which the

average-to-average method would not detect a dumping margin and any

masked dumping would be at its maximum. *See id.* at 56-57 (Appx0083-0084) and Attachment III (Appx0097-0099). Indeed, based on this explanation, the CIT concluded that in the hypothetical described in *Stupp III*, "the meaningful difference test would prevent low-variance sales which pass Cohen's $d$ test from impacting a respondent's dumping margins." *Stupp IV*, 619 F. Supp. 3d at 1328 (Appx0025).

SeAH argues that "Commerce's explanation holds true only if there is only one product under consideration" and crafts a hypothetical to support its claim that a respondent's dumping margin may be affected "when there is more than one product under consideration." *See* SeAH Br. at 27-31. But as the CIT correctly pointed out, "the question before the court is not whether it is possible to construct an unusual scenario where Cohen's $d$ test can result in an alternative comparison method." *Stupp IV*, 619 F. Supp. 3d at 1328 (Appx0026). The standard here is not perfection; it is reasonableness. The fact that SeAH has concocted a hypothetical that produces an anomalous result does not

render Commerce's use of the Cohen's *d* test as part of the differential

pricing analysis unreasonable.

SeAH nowhere asserts that the application of the differential

pricing analysis to its sales data in the underlying investigation had the

effect that SeAH describes in its hypothetical. Nor has SeAH asserted

that Commerce's application of the Cohen's *d* test in the underlying

investigation generated enough of what it calls "false-positives" that it

pushed SeAH's passing sales above the 33 percent threshold of the ratio

test and influenced the meaningful difference test in a way that

resulted in an erroneous or unreasonable application of the mixed

average-to-transaction method.[11] *See Stupp IV*, 619 F. Supp. 3d at 1325

(Appx0019-0020) ("SeAH's attacks on Cohen's *d* test presuppose that

what SeAH claims are 'false positives' automatically affect the accuracy

of Commerce's differential pricing analysis, when in fact Commerce has

_____

[11] In the underlying investigation, 39.72 percent of the value of SeAH's
U.S. sales passed the Cohen's *d* test (*i.e.*, 6.72 percent higher than the
33 percent threshold). As a result, the meaningful difference test
compared SeAH's dumping margin calculated using the average-to-
average method with SeAH's dumping margin calculated using the
mixed average-to-transaction method. *See* Final Determination
Memorandum at 4 (Appx0222); SeAH Final Calculation Memorandum
at 3 (Appx1449).

allowed for 33% positives before there is any potential effect on a respondent's dumping margins.") and 1327-1328 (Appx0025) ("Thus, Cohen's test would need to generate enough 'false positives' to overcome the 33% threshold, at minimum, and there is no evidence on the record suggesting that price patterns … occur with frequency in SeAH's sales.").

SeAH's hypothetical does not constitute actual evidence that Commerce's application of the Cohen's *d* test in the underlying investigation was distortive and unreasonable. *See NSK Ltd. v. United States*, 190 F.3d 1321, 1328 (Fed. Cir. 2003); *Timken v. United States*, 240 F. Supp. 2d 1228, 1236 (Ct. Int'l Trade 2002). Accordingly, it provides no basis to reverse the CIT's decision sustaining Commerce's remand redetermination.

### 4. The Large Threshold Signifies a "Grossly Perceptible" Difference and Is a Conservative Measure of Significance that Results in a Low Percentage of Instances in which the Average-to-Transaction Method Is Applied

The Court has previously held that the large 0.8 threshold is a reasonable measure to identify significant price differences. *See Mid Continent*, 940 F.3d at 673; *see also Stupp III*, 5 F.4th at 1356-1357.

However, in *Stupp III*, the Court expressed a concern that violating the

assumptions of normality, sufficient observation size, and roughly equal

variances that the academic literature associates with the Cohen's *d*

test "can subvert the usefulness of the interpretive cutoffs, transforming

what might be a conservative cutoff into a meaningless comparator." 5

F.4th at 1360. Accordingly, the CIT reviewed whether the remand

redetermination included a reasonable explanation as to "why

{Commerce} can use the 0.8 threshold identified by Dr. Cohen as a

measure of a significant price difference, when Commerce evaluates

data which fails to meet statistical assumptions of normality, size and

variance." *Stupp IV*, 619 F. Supp. 3d at 1326 (Appx0021).

In the remand redetermination, Commerce addressed the specific

concern raised in *Stupp III* and explained why it is appropriate for

Commerce to use the large 0.8 threshold to interpret the effect size and

the magnitude of the price differences identified by the Cohen's *d* test in

the differential pricing analysis. Commerce explained that "Dr. Cohen

specified no limitations for the use of his proposed thresholds to the

interpretation of the calculated value of effect size." Remand

Redetermination at 52 (Appx0079) (citing publication by Dr. Cohen at

Appx3767-3770). The thresholds were "derived from real-world observations," and Dr. Cohen illustrated the differences between the thresholds by using differences in IQ and height purely as examples. *Id.* at 17-18 (Appx0044-0045) (citing publication by Dr. Cohen at Appx3769). Dr. Cohen described the large 0.8 threshold as "the difference in IQ of a PhD graduate and a college freshman, the difference in IQ between a college graduate and a student with only a 50-50 chance of passing high school, or the difference in height between 13 and 18 year-old girls." *Id.* at 18 (citing publication by Dr. Cohen at Appx3770). Contrary to SeAH's contentions, by using IQ and height as illustrative examples, Dr. Cohen did not in any way limit the usefulness of the thresholds as "rules-of-thumb designed for use with heights and IQs and other Normally-distributed data." SeAH Br. at 49.

Dr. Cohen explained that the thresholds are relative and serve as operational definitions. *See* Remand Redetermination at 52 (citing publication by Dr. Cohen at Appx3770). For example, the large threshold used by Commerce in the differential pricing analysis represents a "grossly perceptible" difference. *Id.* From this explanation, the CIT discerned that "Commerce considers a significant difference to

be grossly perceptible in the same way that Dr. Cohen identified a large threshold as one that is 'grossly perceptible.'" *Stupp IV*, 619 F. Supp. 3d at 1326 (Appx0022) (citing publication by Dr. Cohen at Appx3770). SeAH's assertion that Commerce was required to "point to some reason for expecting SeAH's prices to have the same inherent characteristics as the height and IQ data considered by Professor Cohen" is without merit. SeAH's Comments at 14. As the CIT stated, "Commerce's reference to Cohen's work does not circumscribe its discretion to choose the same values in a new context, because that choice is itself reasonable." *Stupp IV*, 619 F. Supp. 3d at 1327 (Appx0024).

SeAH's example using the application of the Cohen's *d* test to its sales of control number 1-03-03-06-1 to customer 102020 does not demonstrate that Commerce's use of the large 0.8 threshold is unreasonable. *See* SeAH Br. at 49-55. As discussed above in Section III.B.3., SeAH's scatter diagram shows that the prices to customer 102020 were [ SALES DATA ] to all other customers, and it is not unreasonable for an objective examiner to interpret this difference as grossly perceptible to the naked eye. The "passing" result for sales of

control number 1-03-03-06-1 to customer 102020 is thus consistent with Dr. Cohen's operational definition for the large 0.8 threshold.

Furthermore, the CIT stated that although Commerce considered it important that Dr. Cohen's thresholds are widely acknowledged yardsticks in the statistical literature, the explanation in the remand redetermination "does not rely on the prominence of this yardstick alone." *Stupp IV*, 619 F. Supp. 3d at 1327 (Appx0023). Specifically, Commerce explained in its expert judgment that it selected the large 0.8 threshold "as a conservative standard to determine that the observed price differences are significant" and that this aspect of the Cohen's *d* test along with the subsequent components of the differential pricing analysis "ensures the reasonable and limited application of the alternative comparison methodology." Remand Redetermination at 18 and 33 (Appx0045, Appx0060).

In fact, Commerce found that it applied the average-to-transaction method to roughly 20 percent of all respondents with calculated rates in final determinations issued in calendar year 2015 and calendar year 2021. *See id.* at 32 and Attachment 1 (Appx0059, Appx0093-0094). SeAH questions the relevance of this analysis. *See* SeAH Br. at 38-39.

58

But the analysis constitutes empirical evidence that directly addresses the Court's concern in *Stupp III* that Commerce's use of the Cohen's *d* test may produce an upward bias with more passing sales and higher dumping margins. The limited frequency with which Commerce applies some form of the average-to-transaction method indicates that the Cohen's *d* test is not finding significant price differences where none exist and does not result in artificially inflated dumping margins. In practice, the default average-to-average method is applied to most respondents, and the alternative average-to-transaction method is the exception.

SeAH also asserts that Commerce's analysis is misleading because it is "skewed by the inclusion of investigations where the dumping margins would have been above *de minimis* regardless of whether the A-to-A and A-to-T methodology was used to calculate the margin." SeAH Br. at 40. While Commerce determined in the underlying investigation here that there was a meaningful difference in SeAH's margin because the margin for the average-to-average method was *de minimis* and the margin for the mixed average-to-transaction method was above *de minimis*, the differential pricing analysis recognizes a

59

meaningful difference in two situations. As explained in *Stupp III*,
Commerce considers there to be a meaningful difference "{i}f the margin
for the average-to-average method is below the *de minimis* threshold
and the margin for the tentatively selected method is above that
threshold, or if both are above that threshold and the margin for the
tentatively selected method is 25% greater than the average-to-average
margin." 5 F.4th at 1347. It was reasonable for Commerce to examine
the overall impact that the large 0.8 threshold had on the results of the
differential pricing analysis and the dumping margin calculation
method across all final determinations in calendar years 2015 and 2021.
Including the two situations that constitute a meaningful difference did
not "skew" the analysis.

Finally, SeAH asserts that "Commerce's use of the {differential
pricing analysis} transformed *de minimis* margins into affirmative
determinations of dumping in more than 50 percent of the
investigations in which there would have been a negative determination
under the A-to-A methodology." SeAH Br. at 42. As an initial matter,
SeAH incorrectly states that the margin is "transformed" from *de
minimis* to non-*de minimis* in these investigations. If there is a

meaningful difference because the margin calculated using the average-to-average method is *de minimis* and the margin calculated using the average-to-transaction method crosses the *de minimis* threshold, then the average-to-average method is unable to uncover the masked dumping that was occurring. No "transformation" occurs. SeAH's analysis is also flawed because it does not include one of the two situations that constitute a meaningful difference, *i.e.*, where the dumping margins were above *de minimis* for the average-to-average method and the average-to-transaction method.

In addition, SeAH's analysis of investigations from 2015 through 2021 is misleading because it tallies the number of investigations in which the average-to-transaction method was applied. However, Commerce usually examines multiple respondents in less-than-fair-value investigations. Commerce's analysis took the additional step of looking at its treatment of each respondent and counted the number of respondents with dumping margins that were calculated using some form of the average-to-transaction method to get a true measure of the extent to which this method is applied. SeAH included this type of analysis for final determinations issued from 2015 through 2021 in its

brief at the CIT, but it opted not to do so in its opening brief in this appeal. *See* SeAH Comments on Remand Redetermination at 34 (Appx5632). That analysis showed that in final determinations issued from 2015 through 2021, Commerce applied some form of the average-to-transaction method to less than 25 percent of respondents with calculated rates (70 out of 288). *Id.* This percentage is consistent with Commerce's analysis of investigations in 2015 and 2021.

<center>*    *    *</center>

Commerce's remand redetermination fully addressed the concerns expressed by this Court in *Stupp III* regarding the application of the Cohen's *d* test and the large 0.8 threshold when the data being examined are not normally distributed, have a small number of observations, and have disparate (and potentially small) variances. SeAH's contentions to the contrary are devoid of merit and should be rejected.

## <u>CONCLUSION</u>

For the foregoing reasons, the CIT correctly upheld Commerce's use of the Cohen's *d* test as part of the differential pricing analysis as a reasonable means of effectuating the statutory purpose of unmasking

targeted dumping in 19 U.S.C. § 1677f-1(d)(1)(B). Commerce's

application of the analysis in the less-than-fair-value investigation of

welded line pipe imports from Korea was likewise reasonable, and the

results of the analysis supported Commerce's decision to calculate

SeAH's dumping margin by using the average-to-transaction method

only for the U.S. sales that passed the Cohen's *d* test. Accordingly,

Welspun respectfully requests that the Court affirm the CIT's

judgment.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin
Jeffrey D. Gerrish
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for Welspun Tubular
LLC USA*

</div>

Date: November 6, 2023

---

* Only admitted in New York and New Jersey. Practice limited to
matters before Federal courts and agencies.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1663

**Short Case Caption:** Stupp Corporation v United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __11,986__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __11/06/2023__

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

Save for Filing

**FORM 31. Certificate of Confidential Material**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2023-1663

**Short Case Caption:** Stupp Corporation

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains <u>4</u> number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 11/06/2023

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2023-1663

**Short Case Caption** Stupp Corporation v United States

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on _____

by ☐ U.S. Mail ☐ Hand Delivery ☐ Email ☐ Facsimile
☑ Other: Secure File Transfer Protocol

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Robert R. Kiepura | robert.kiepura@usdoj.gov |
| Jeffrey M. Winton | jwinton@jmwinton.com |
|  |  |
|  |  |
|  |  |

☐  Additional pages attached.

Date: 11/06/2023

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin