NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**STUPP CORPORATION, A DIVISION OF STUPP BROS., INC., IPSCO TUBULARS INC., MAVERICK TUBE CORPORATION,**
*Plaintiffs*

**WELSPUN TUBULAR LLC USA,**
*Plaintiff-Appellee*

v.

**UNITED STATES,**
*Defendant-Appellee*

**HYUNDAI STEEL COMPANY,**
*Defendant*

**SEAH STEEL CORP.,**
*Defendant-Appellant*

---

2023-1663

---

Appeal from the United States Court of International Trade in Nos. 1:15-cv-00334-CRK, 1:15-cv-00336-CRK, 1:15-cv-00337-CRK, Judge Claire R. Kelly.

---

Decided: April 23, 2025

---

JEFFREY DAVID GERRISH, Schagrin Associates, Washington, DC, argued for plaintiff-appellee. Also represented by NICHOLAS J. BIRCH, SAAD YOUNUS CHALCHAL, CHRISTOPHER CLOUTIER, ELIZABETH DRAKE, WILLIAM ALFRED FENNELL, LUKE A. MEISNER, ROGER BRIAN SCHAGRIN.

ROBERT R. KIEPURA, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by CLAUDIA BURKE, PATRICIA M. MCCARTHY, YAAKOV ROTH; VANIA WANG, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

JEFFREY M. WINTON, Winton & Chapman PLLC, Washington, DC, argued for defendant-appellant. Also represented by MICHAEL JOHN CHAPMAN, VI MAI.

_____

Before LOURIE, BRYSON, and STARK, *Circuit Judges*.

Additional views filed by *Circuit Judge* STARK.

STARK, *Circuit Judge*.

SeAH Steel Corporation ("SeAH"), a Korean manufacturer of welded line pipe, appeals the decision of the Court of International Trade ("Trade Court") sustaining the third remand redetermination by the U.S. Department of Commerce ("Commerce") in its 2015 less-than-fair-value ("LTFV") investigation of welded line pipe imported from the Republic of Korea ("Korea"). The Trade Court judgment affirmed Commerce's assignment of a 2.53% antidumping duty on SeAH's imports. J.A. 3. Consistent with our precedential opinion in *Marmen Inc. v. United States Wind Tower Trade Coalition*, No. 23-1877 ("*Marmen*"), we vacate and remand for Commerce to have an opportunity

to "re-perform a differential pricing analysis" that "may not rely on Cohen's *d* test." Slip Op. at 23.

I

The facts of this case are set out in detail in our earlier decision, *Stupp Corporation v. United States*, 5 F.4th 1341, 1344-45, 1348 (Fed. Cir. 2021). A short summary suffices for present purposes.

In the course of its LTFV investigation, Commerce determined that SeAH engaged in targeted dumping; that is, "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B). Such targeted dumping can be "masked," and go undetected – and, therefore, unaddressed by imposition of an anti-dumping duty – "because a respondent's sales of low-priced dumped merchandise would be averaged with (and offset by) sales of higher-priced masking merchandise, giving the impression that no dumping was taking place." *Stupp*, 5 F.4th at 1345 (internal quotation marks omitted). "To address the problem of targeted dumping, Congress created an exception to the use of the average-to-average [A-to-A] method" Commerce ordinarily uses "for calculating a dumping margin." *Id.* "Commerce refers to the alternative method of calculating a weighted average dumping margin as the 'average-to-transaction' [A-to-T] method." *Id.* Commerce sometimes also employs "some hybrid of the two," combining the average-to-average and average-to-transaction methods. *Marmen*, Slip Op. at 16.

To "implement[] Congress's directive" to uncover targeted dumping, and determine whether to use the A-to-A, A-to-T, or hybrid comparison methodology, Commerce uses a "differential pricing analysis." *Stupp*, 5 F.4th at 1346. "The differential pricing analysis involves three tests . . . : (1) Cohen's *d* test, (2) the ratio test, and (3) the meaningful difference test." *Marmen*, Slip Op. at 16 n.2 (internal quotation marks and citations omitted).

This appeal is focused on the first of these steps, Cohen's *d* test, which is "named after statistician Jacob Cohen" and is used "to evaluate whether the test group differs significantly from the comparison group." *Stupp*, 5 F.4th at 1346. "If the Cohen's *d* value is equal to or greater than 0.8 for any test group, the observations within that group are said to have 'passed' the Cohen's *d* test, i.e., Commerce deems the sales prices in the test group to be significantly different from the sales prices in the comparison group." *Id.* at 1347.

As we set out when this case was before us in 2021, "Commerce applied its differential pricing analysis to SeAH's sales of welded line pipe and selected the hybrid approach for calculating SeAH's weighted average dumping margin. That approach resulted in a weighted average dumping margin of 2.53%." *Id.* at 1348 (internal citations omitted). After the Trade Court affirmed Commerce, SeAH appealed to us and contended (as relevant here) that "Commerce misused the Cohen's *d* test in its differential pricing analysis," because "the data in this case did not satisfy the conditions required to achieve meaningful results from the Cohen's *d* test." *Id.* at 1357. We "agree[d] that there are significant concerns relating to Commerce's application of the Cohen's *d* test in this case and, more generally, in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances." *Id.* We expressed concern, in particular, that "Commerce's application of the Cohen's *d* test to data that do not satisfy the assumptions on which the test is based may undermine the usefulness of the interpretive cutoffs." *Id.* Therefore, we remanded "to give Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case or whether those limits need not be observed when Commerce uses the Cohen's *d* test in less-than-fair-value adjudications." *Id.* at 1360.

On remand, Commerce again applied its differential pricing analysis, including Cohen's $d$ test, and concluded that the "statistical criteria do not serve as a basis for Dr. Cohen's thresholds." J.A. 37. Accordingly, in Commerce's view, Cohen's $d$ test can reasonably be used even when the data being analyzed does not satisfy the three statistical criteria about which we had raised concern in the earlier appeal. SeAH again appealed to the Trade Court, which determined that "Commerce has adequately explained how its methodology," including its use of Cohen's $d$, "is reasonable." J.A. 27. SeAH timely appealed to us. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II

The Trade Court judgment we are reviewing sustained Commerce's imposition of a 2.53% anti-dumping duty on SeAH. The Trade Court was persuaded that Commerce had satisfactorily explained why it was reasonable to use Cohen's $d$ test under circumstances in which the statistical requirements for use of Cohen's $d$ are not met. Before us, the government defends Commerce's analysis and asks us to agree with the Trade Court's conclusion that limits on the use of Cohen's $d$ "are only relevant as a matter of statistical significance, and do not apply when analyzing a whole population." *Stupp Corp. v. United States*, 619 F. Supp. 3d 1314, 1323 (Ct. Int'l. Trade Feb. 24, 2023). The government further argues that the second and third steps of its differential pricing analysis, namely the ratio test and meaningful difference test, "compensate for the . . . possible inaccuracies" that may result from use of Cohen's $d$ on data not meeting the statistical requirements of that test. Gov't Br. at 13.

The problem for the government is that it made these precise arguments in *Marmen* and we rejected them. In particular, in *Marmen* we held it is "unreasonable for Commerce to use Cohen's $d$ as part of its differential pricing analysis when the test is applied to data sets that do not

satisfy the statistical assumptions" on which Cohen's $d$ is predicated. Slip Op. at 19. The three "required assumptions" for Cohen's $d$ are "normal distributions, equal variability, and equal and sufficiently numerous data." *Id.* at 15. There was "no dispute that Marmen's data does not satisfy these assumptions" and, therefore, we held, "Cohen's $d$ cannot be used . . . to determine 'a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchaser, regions, or periods of time." *Id.* (quoting 19 U.S.C. § 1677f-1(d)(1)(B)).

We confront the very same situation here, and we are compelled to reach the same result. Here, as in *Marmen*, it is undisputed that SeAH's U.S. pricing data fails to satisfy the statistical assumptions necessary to permit a reasonable application of Cohen's $d$ in a differential pricing analysis: "normal distributions, equal variability, and equal and sufficiently numerous data." Slip Op. at 15. Commerce's assertion that these assumptions "need not be observed," Gov't Br. at 14, 16 n.5, is no longer a tenable position (if it ever was). Accordingly, we hold that it was unreasonable for Commerce to use Cohen's $d$ as part of its differential pricing analysis in this case. We vacate the judgment of the Trade Court and remand for that court to remand to Commerce, which may re-perform a differential pricing analysis without relying on Cohen's $d$. [1]

---

[1] We reject SeAH's request that we instruct Commerce to apply the average-to-average comparison methodology and its resulting 1.97% margin, which would be considered *de minimis* and, therefore, result in no duty being imposed. On remand, Commerce has discretion to do as SeAH wishes, but it also has the opportunity, if it prefers, to re-perform a differential pricing analysis without using Cohen's $d$, which may result in the use of the average-to-transaction comparison or a hybrid methodology.

### III

We have considered the government's remaining arguments and find them unpersuasive. Thus, we vacate and remand for proceedings consistent with this opinion.

**VACATED AND REMANDED**

COSTS

Costs to SeAH.

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**STUPP CORPORATION, A DIVISION OF STUPP BROS., INC., IPSCO TUBULARS INC., MAVERICK TUBE CORPORATION,**
*Plaintiffs*

**WELSPUN TUBULAR LLC USA,**
*Plaintiff-Appellee*

v.

**UNITED STATES,**
*Defendant-Appellee*

**HYUNDAI STEEL COMPANY,**
*Defendant*

**SEAH STEEL CORP.,**
*Defendant-Appellant*

---

2023-1663

---

Appeal from the United States Court of International Trade in Nos. 1:15-cv-00334-CRK, 1:15-cv-00336-CRK, 1:15-cv-00337-CRK, Judge Claire R. Kelly.

---

STARK, *Circuit Judge*, additional views.

Were we writing on a blank slate, I might well be persuaded by Commerce that its use of Cohen's *d* test, as one step in its three-step differential pricing analysis, is reasonable. *See generally Stupp*, 5 F.4th at 1353 ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness . . . ."). Moreover, had Commerce not labelled what it is doing at step one as "Cohen's *d*," and had it not tried to borrow credibility for its test by reference to Dr. Cohen's extensive work and other literature endorsing Cohen's *d*, I might agree it should be permitted to use something quite like Cohen's *d* as a rough, initial "measur[e] [of] the practical significance of price difference[s]." Gov't Br. at 17. After all, Commerce has expertise we lack and broad discretion to decide how to perform its statutory duty to identify targeted dumping. *See id.* at 1346 ("Congress has not delineated exactly how Commerce is to assess whether there is a pattern of export prices . . . differ[ing] significantly among purchasers, regions, or periods of time, or how Commerce is to explain[] why such differences cannot be taken into account using the average-to-average or transaction-to-transaction methods.") (internal quotation marks omitted; alterations in original).

But, of course, we are not addressing a question of first impression. Quite the contrary. *Marmen* precedentially holds it is "unreasonable" for Commerce to use Cohen's *d* when the three assumptions underlying it – "normal distributions, equal variability, and equal and sufficiently numerous data" – are not satisfied. Slip Op. at 23. Additionally, the Court remanded this very case nearly four years ago to give Commerce an opportunity to explain why meeting these assumptions is not necessary and, as *Marmen* well and thoroughly describes, Commerce did not do so in a particularly persuasive manner. *See id.* at 15-23. And this case does not call on us to assess the broader question of whether Commerce can

STUPP CORPORATION v. US                                              3

ever reasonably rely on rules of thumb that are not statistically grounded.

Thus, I entirely agree with my colleagues that we must vacate the judgment of the Court of International Trade and instruct it to remand to Commerce, which may choose to re-perform a differential price analysis without using Cohen's *d*.